# EXHIBIT P

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD    Form DAB-101 (08/09)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review)<br><br>Edwin Banks | 2. ALJ APPEAL NUMBER (on the decision or dismissal)<br><br>1-8136495060 |
|---|---|
| 3. BENEFICIARY*<br><br>Edwin Banks | 4. HEALTH INSURANCE CLAIM NUMBER (HICN)*<br><br>█████8912A |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, HICNs, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER<br>Novocure, Inc. | 6. SPECIFIC ITEM(S) OR SERVICE(S)<br>E0766 |
|---|---|

7. Medicare claim type:  ☐ Part A  ☑ Part B  ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan  ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
  ☐ Yes   If Yes, skip to Block 9.
  ☑ No   If No, Specific Dates of Service:  1/25/18, 3/12/18, 4/12/18

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☑ No

I request that the Medicare Appeals Council review the ALJ's ☑ decision or ☐ dismissal order [check one] dated 6/3/2019_____ .  I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

Please see attached.

_____

_____

_____

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE<br>7/8/2019 |
|---|---|
| APPELLANT'S SIGNATURE (the party requesting review) | REPRESENTATIVE'S SIGNATURE (include signed appointment of representative if not already submitted.) |
| PRINT NAME | PRINT NAME<br>Debra M. Parrish |
| ADDRESS | ADDRESS<br>788 Washington Road |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE<br>Pittsburgh, PA  15228 |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER<br>412-561-6250 | FAX NUMBER<br>412-561-6253 | E-MAIL<br>debbie@dparrishlaw.com |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (08/09)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

# PARRISH LAW OFFICES

788 WASHINGTON ROAD

PITTSBURGH, PENNSYLVANIA 15228-2021

www.dparrishlaw.com

412.561.6250

FAX 412.561.6253

E-mail: info@dparrishlaw.com

July 8, 2019

***VIA MEDICARE OPERATIONS DIVISION E-FILE***

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building, Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

>          Re:   **ALJ Appeal No.: 1-8136495060**
>                **Decision Date:  June 3, 2019**
>                **Appellant:  Edwin Banks**
>                **Beneficiary:  Edwin Banks**
>                **HICN: ███████8912A**
>                **Dates of Service: 1/25/18, 3/12/18, 4/12/18**
>                **Service:  E0766**
>                **Our Ref:  18-100**

Dear Medicare Appeals Council:

   Edwin Banks hereby appeals the attached June 3, 2019 unfavorable decision by
Administrative Law Judge Bruce Kelton with respect to the above-identified case.  See
Attachment 2.  Appellant appeals the unfavorable portion of the decision based on mistake of
fact and mistake of law.

   **I.      The issues to be considered in the appeal are:**

   1. Did the ALJ make a mistake of fact/law when he erroneously thought that Mr.
      Banks was seeking to invalidate LCD L34823 rather than merely seeking a
      deviation from the LCD?

   2. Did the ALJ make a mistake of law when he did not give deference to the
      reasonable interpretation of the LCD offered by the issuing authority (the
      DMAC Medical Directors) and did not find that the DMAC's interpretation
      was "arbitrary, capricious, or manifestly contrary to the [LCD]"?

PARRISH LAW OFFICES

3. Did the ALJ make a mistake of law when he failed to give *de novo* review of the evidence in a particular case because of an apparent concern that that same evidence might be used to invalidate an LCD more generally?

4. Did the ALJ make a mistake of law when he failed to apply the principle of collateral estoppel?

5. Was TTFT reasonable and medically necessary, and entitled to Medicare coverage when prescribed for Mr. Banks?

## II.    Introduction

Glioblastoma (GBM) is the most aggressive form of cancer that begins in the brain and is extremely lethal. Without treatment, survival is typically three months. With treatment (but not with the Optune system), survival is typically 12-15 months and only 3-5% of patients survive longer than 5 years.

Mr. Banks was prescribed an Optune system for his newly diagnosed brain cancer (GBM). The Optune system delivers tumor treatment field therapy (TTFT). TTFT creates an electrical field that disrupts and corrupts the division of cancer cells and leads to the death of such cells. In 2011 and 2015, the FDA approved, through its more rigorous review process, the Optune device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. See Ex. 3, pg. 53-57. The initial FDA approval was for recurrent glioblastoma. The FDA then approved the Optune device for newly diagnosed glioblastoma. See October 5, 2015 letter on CD attached to request for hearing. During the clinical trial for newly diagnosed glioblastomas, the interim TTFT results were so compelling (i.e., the treatment was able to show significant clinical benefit) that the Data Safety Monitoring Board recommended early termination of the study to enable patients not receiving the treatment to cross over and receive the treatment, deeming it to be unethical to withhold TTFT from those not receiving it. The FDA agreed.

All the claims at issue were denied by the contractor citing LCD L34823 which simply states: "TTFT will be denied as not reasonable and necessary." The QIC denied the claims citing the LCD and finding that the medical records did not quantify the effectiveness of the device for Mr. Banks.

Significantly, the DMAC medical directors issued a letter indicating that LCD L34823 does NOT apply to newly diagnosed glioblastoma and that they intended to undertake the LCD development process for the same. See prehearing brief. Indeed, on May 9, 2019, the DMACs issued a draft LCD indicating that TTFT met Medicare's coverage criteria based on the 2017 JAMA study. On May 28, 2019 the Civil Remedies Division found the LCD record did not support the validity of the LCD under the reasonableness standard. The ALJ's decision is premised on the Council's M-15-1354 decision and adopted its rationale when applying the LCD.

PARRISH LAW OFFICES

### III.    Satisfaction of Medicare Coverage Criteria

Before turning to the ALJ's decision, and the errors therein, whether TTFT should be covered applying normal coverage rules is addressed.

All of the claims initially were denied by the Medicare contractor on the basis that TTFT was not reasonable and medically necessary generally and that the peer-reviewed literature does not document the effectiveness of the device. With respect to the second point, the evidence to the contrary is overwhelming. The data from the clinical trial for newly diagnosed glioblastomas demonstrated such remarkable effectiveness that the study was terminated early to enable those not receiving treatment during the clinical trial to receive the treatment. See Ex. 3, pgs 4-25. The FDA approved the device as effective. See Ex. 3. Because the peer-reviewed literature is so compelling, the NCCN guidelines give TTFT a level 1 recommendation for newly diagnosed glioblastomas, i.e., uniform agreement exists among the experts based on the highest level of evidence, that TTFT should be offered to those newly diagnosed with a glioblastoma. Ex. 3 at 1-3. That recommendation existed long before the dates of service. Thus, the experts agree that the peer-reviewed literature meets the highest level of evidence possible. Indeed, LCD L34823 does not refer to any studies after 2013, and does not mention the FDA's approval of TTFT therapy for treatment of primary glioblastoma multiforme."

TTFT satisfies the other two coverage criteria – the consensus of experts and widespread adoption. The consensus of experts (reflected in the NCCN guidelines and adoption by all the major medical centers in the United States), and acceptance by the relevant medical community (again in view of the inclusion in practice guidelines, the device has been prescribed in every state by hundreds of clinicians and is covered by all major payers), strongly support Medicare coverage.

The ALJ should have undertaken the foregoing analysis, which he did not. Accordingly, there is not substantial evidence to support a coverage denial, especially here where the Optune system is the standard of care. A policy that conflicts with the standard of care must be based on convincing evidence. The only evidence of record is that the Optune system is medically reasonable and necessary for Mr. Banks.

### IV.    Errors of Law and Fact

Turning to the ALJ's decision, the ALJ denied coverage on the basis of LCD L34823. That was in error.

#### A. Proper Review/Consideration of an LCD

As an initial matter, the ALJ misapprehended both Appellant's argument and his role when considering an LCD. Of course, an ALJ cannot set aside or review the validity of an LCD as a categorical matter. See 42 C.F.R. § 405.1062(c). There is a separate process for doing that and the result there applies to all cases, not merely the individual beneficiaries' claims for

coverage. See 42 C.F.R. § 426.310; § 426.460(b)(2). Indeed, on May 28, 2019, the Civil Remedies Division ruled that the LCD record did not support the validity of the LCD under the reasonableness standard.

Nevertheless, when considering an individual appeal of a coverage denial, an ALJ is not bound by an LCD. See 42 C.F.R. § 405.1062(a). Instead, an ALJ must merely give substantial deference to it and explain his reasons should he decline to follow an LCD in a particular case. See 42 C.F.R. § 405.1062(b). An ALJ's decision to decline to follow an LCD in a particular case has no precedential effect and does not result in the setting aside or invalidity of an LCD. See 42 C.F.R. § 405.1062(b). An ALJ's decision on whether to apply an LCD to a particular case is based on the facts/arguments presented in that case. Of course, Medicare beneficiaries are entitled to an individualized consideration of their appeals by an ALJ on a *de novo* basis. See 42 C.F.R. § 405.1000(d). Accordingly, rather than being precluded from reviewing whether an LCD should apply to a particular case, ALJs have a duty to determine just that.

In the present case, Mr. Banks did not ask the ALJ to review and pass on the validity of LCD L34823. Instead, Mr. Banks asked the ALJ to consider his case *de novo*, based on the facts of the case, and the arguments presented and determine whether LCD L34823 should be applied. The ALJ apparently thought that Mr. Banks was seeking to invalidate LCD L34823 and issued a ruling accordingly. That was an error of fact/law.

### B. DME MAC Medical Directors' Letter

As noted above, in the present case, Mr. Banks submitted a letter from the DMAC Medical Directors (i.e., the very entities that issued LCD L34823) indicating that L34823 was not intended to apply to newly diagnosed GBMs – like Mr. Banks's – as opposed to recurrent GBMs. Nevertheless, the ALJ did not consider that letter.

No doubt the Medicare Appeals Council is aware that a bedrock principle of regulatory construction/interpretation is that the reasonable interpretation of the issuing authority is entitled deference. See *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Further, the burden is not on the issuing authority to show that its interpretation is reasonable or the only possible/permissible interpretation. Id. at 843-844. Instead, the burden is on the party challenging the interpretation to show that the issuing authorities' interpretation is unreasonable. Id. at 866.

Here, the entity charged with issuing LCDs, the DMAC Medical Directors, has interpreted the LCD as not applying to newly diagnosed GBMs. There was no basis for the ALJ to substitute his own interpretation of the LCD. Regardless of the ALJ's non-expert interpretation of the sources used by the LCD, the issuing authority - the DMACs – believe that the LCD is properly interpreted as not applying to non-recurrent GBMs. Importantly, the ALJ did not find that the DMACs interpretation was "arbitrary, capricious, or manifestly contrary to the [LCD]". Accordingly, the ALJ made an error of law when he failed to defer to the issuing authority's reasonable interpretation of the LCD.

PARRISH LAW OFFICES

The DMAC's interpretation of its LCD is born out by the facts. The LCD record for L34823 clearly shows that the DMAC medical directors did not consider any of the clinical and scientific evidence with respect to TTFT that issued after 2014 and confined their assessment of TTFT to recurrent glioblastoma. Further, the draft LCD indicates that TTFT met Medicare coverage criteria in 2017.

### C. Failure to Comply With 42 C.F.R. § 405.1062(a)/(d)

As noted above, ALJs are not bound by LCDs and only give deference to them. See 42 C.F.R. § 405.1062(a). Further, ALJs are commanded to conduct a *de novo* review of the case. See 42 C.F.R. § 405.1062(d). Accordingly, there must be some fact(s) that a beneficiary could present that would cause the ALJ to not defer to an LCD. To hold otherwise would contradict the command of § 405.1062(a).

In the present case, Mr. Banks presented evidence that, *after LCD L34823 issued*:

1) the FDA approved the device as safe and effective;
2) Published studies demonstrated the conclusive safety and effectiveness of TTFT;
3) The consensus of experts is that TTFT is safe and effective;
4) NCCN guidelines gave TTFT a level 1 recommendation for newly diagnosed glioblastomas;
5) A clinical trial of TTFT for newly diagnosed GBM was halted because it would have been unethical to deny TTFT to the study participants that were not selected for treatment; and
6) TTFT became the standard of care for newly diagnosed GBM.

Of course, Mr. Banks also presented evidence of his own medical condition.

In his decision, the ALJ found that this evidence (other than the evidence of Mr. Banks's medical condition) challenged "the validity of the LCD" rather than the "facts of a particular case" and, therefore, rejected it. Respectfully, the ALJ's reasoning in this regard reflects an error in both the evidence on which an ALJ's decision is to be based, and the ALJ's role in the process. As prescribed by 42 C.F.R. § 405.1000(d), an ALJ's decision is based on the "administrative record", i.e., the record in the specific case. Thus, in one case a beneficiary may offer evidence sufficient to deviate from an LCD while in another case a beneficiary may not offer evidence of the same level.

The very idea that a decision based on the evidence offered by Mr. Banks would not be "case-specific" fails to comport with 42 C.F.R. § 405.1000(d)'s command that an ALJ's decision be based on the "administrative record." Again, as noted above, an ALJ decision in an individual appeal applies only in that specific case.

Respectfully, it is very difficult to follow the ALJ's comments reasoning that Mr. Banks's evidence would "categorically" reject the validity of the LCD. Decision at 6. Again, as noted above, an ALJ decision is based on the record in a specific case and applies only in that

specific case. The ALJ seems to be indicating that the more powerful the evidence offered to deviate from an LCD, the more it must be rejected. That is flawed. There is certainly no reason to reject evidence in an individual case simply because that same evidence might be offered in an LCD challenge case. Indeed, doing so would engage in the very evil described by the ALJ – conducting an LCD challenge in an individual case and viewing the record from that perspective.

Further treating the evidence of later developments as the ALJ did would result in ALJs being bound by LCDs. Indeed, applying the ALJ's logic, the more compelling the evidence in a particular case that an LCD should not be followed, the more that evidence must be rejected. Such an approach is not in keeping with § 405.1062(a) and § 405.1062(d)'s command of mere "deference" to an LCD and de novo review.

In the present case, Mr. Banks offered evidence that TTFT has become the standard of care, etc. and is, literally, a life-saving treatment for his deadly form of brain cancer. The ALJ's refusal to consider that evidence because of a fear that that same evidence might be used to invalidate the LCD was an error of law.

### D. Collateral Estoppel

Finally, Mr. Banks received a prior favorable ALJ decisions on other dates of service for the same device for the same condition. See ALJ Nos. 1-8428973391 and 1-8498071113. Accordingly, the Secretary is estopped from denying her claims for TTFT. The Secretary is barred by the doctrine of collateral estoppel/issue preclusion from re-litigating those issues. As noted by a unanimous Supreme Court:

> We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality. When an administrative agency is acting in a judicial capacity and resolves dispute issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution. The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity.

See *Astoria Federal Savings and Loan Assoc. v. Solimino*, 501 U.S. 104, 107-8 (1991) (internal citations and quotations omitted). No basis exists for the Secretary to ignore the prior coverage rulings for this Medicare beneficiary.

PARRISH LAW OFFICES

### V.     Conclusion

The Optune system was reasonable and medically necessary when it was provided to Mr. Banks. The denial is contrary to the facts and law. The ALJ committed fundamental errors of law when he denied a Medicare beneficiary coverage of a service which has extended his life and applied an LCD that the DMAC medical directors have indicated does not apply to his condition. Based on the foregoing, the Council should reverse Judge Kelton's decision and order coverage of the Optune system for Mr. Banks consistent with the standard of care.

Please contact me if you have any questions regarding this appeal.

Yours very truly,

Debra Pistorino Parrish

Enclosures:
Attachment 1:  Appointment of Representative [UPLOADED TO DAB E-FILE]
Attachment 2:  June 3, 2019 ALJ Decision [UPLOADED TO DAB E-FILE]
Attachment 3:  May 9, 2019 Draft LCD
Attachment 4:  CRD Ruling May 28, 2019

cc:     E. Banks
        Novocure, Inc.
        C2C Innovative Solutions, Inc.

# ATTACHMENT 1:

## Appointment of Representative

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0950

## APPOINTMENT OF REPRESENTATIVE

| NAME OF PARTY | MEDICARE OR NATIONAL PROVIDER IDENTIFIER NUMBER |
|---|---|
| Edwin R. Banks | ███8912A |

### SECTION I: APPOINTMENT OF REPRESENTATIVE

To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):

I appoint this individual: __Debra M. Parrish__ to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the "Act") and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my appeal, wholly in my stead. I understand that personal medical information related to my appeal may be disclosed to the representative indicated below.

| SIGNATURE OF PARTY SEEKING REPRESENTATION | DATE |
|---|---|
| *Edwin R. Banks* | 07/25/2018 |

| STREET ADDRESS | PHONE NUMBER (with Area Code) |
|---|---|
| 128 Huntington Chase Drive | 256-603-3257 |

| CITY | STATE | ZIP |
|---|---|---|
| Madison | AL | 35758 |

### SECTION II: ACCEPTANCE OF APPOINTMENT

To be completed by the representative:

I, __Debra M. Parrish__, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services; that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an __ATTORNEY__ (Debra M. Parrish)
(PROFESSIONAL STATUS OR RELATIONSHIP TO THE PARTY, E.G. ATTORNEY, RELATIVE, ETC.)

| SIGNATURE OF REPRESENTATIVE | DATE |
|---|---|
| | 7/26/2018 |

| STREET ADDRESS | PHONE NUMBER (with Area Code) |
|---|---|
| 788 Washington Road | (412)561-6250 |

| CITY | STATE | ZIP |
|---|---|---|
| Pittsburgh | PA | 15228 |

### SECTION III: WAIVER OF FEE FOR REPRESENTATION

Instructions: This section must be completed if the representative is required to, or chooses to waive their fee for representation. (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and must complete this section.)

I waive my right to charge and collect a fee for representing _____
before the Secretary of the Department of Health and Human Services.

| SIGNATURE | DATE |
|---|---|
| | |

### SECTION IV: WAIVER OF PAYMENT FOR ITEMS OR SERVICES AT ISSUE

Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act. (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.)

I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| SIGNATURE | DATE |
|---|---|
| | |

Form CMS-1696 (10/10)

# ATTACHMENT 2:

## June 3, 2019 ALJ Decision



Department of Health and Human Services
Office of the Secretary

*18-100 uF*

## OFFICE OF MEDICARE HEARINGS AND APPEALS

Irvine Field Office
19 Technology Drive, Suite 200
Irvine, CA 92618
949-788-8000 (Main)
949-788-3693 (ALJ Kelton Team)
949-788-2780 (FAX)
866-495-7414 (Toll Free)

Date: JUN 0 3 2019

ALJ Appeal Number: 1-8136495060

Appellant:    DEBRA M PARRISH
              788 WASHINGTON RD
              PITTSBURGH, PA 15228

### NOTICE OF DECISION

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 days of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision. If you are not already represented, you may appoint an attorney or other person to represent you. How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal within 60 calendar days of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.
How do I file an appeal?

OMHA-1051T                              Page 1 of 4

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). Please do not submit your request for review using more than one method. Regardless of how you file your appeal, you must always send a copy of your written request for review to the other parties who received a copy of the decision.

If you are filing a written request for review, you may use the enclosed Request for Review (Form DAB-101), or you may write a letter containing the following:
•       The Beneficiary's/enrollee's name (and telephone number for Part D appeals);
•       The Beneficiary's/enrollee's health insurance claim number;
•       The item(s), service(s), or specific Part D drug(s) in dispute;
•       The specific date(s) the item(s) or service(s) were provided, if applicable;
•       For Part D appeals, the plan name;
•       For Part D appeals, the OMHA Appeal Number on the adjudicator's dismissal;
•       For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
•       The date of the adjudicator's decision (not required for Part D appeals); and
•       Your name and signature, and, if applicable, the name and signature of your representative.

Filing by mail:

Mail your appeal and a copy of the enclosed decision to:
Department of Health and Human Services
        Departmental Appeals Board
        Medicare Appeals Council, MS 6127
        Cohen Building Room G-644
        330 Independence Ave., S.W.
        Washington, D.C. 20201

Filing by fax:

Fax your appeal and a copy of the enclosed dismissal to (202) 565-0227.
Filing by computer:
Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at https://dab.efile.hhs.gov/mod.
To file a new appeal using MOD E-File, you will need to register by:
(1)    Clicking Register on the MOD E-File home page;
(2)    Entering the information requested on the "Register New Account" form; and
(3)    Clicking Register Account at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at https://dab.efile.hhs.gov/mod/users/new. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:
| | |
|---|---|
| (1) | Logging into MOD E-File; |
| (2) | Clicking the File New Appeal menu button on the top right of the screen; |
| (3) | Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and |
| (4) | Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal – Medicare Operations Division" form.  You are required to provide information and documents marked with an asterisk. |

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision.  All documents should be submitted in Portable Document Format (PDF) whenever possible.  Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

| | |
|---|---|
| (1) | Request for Review; |
| (2) | Appointment of Representative form (OMB Form 0938-0950); |
| (3) | Copy of Administrative Law Judge or attorney adjudicator decision; |
| (4) | Memorandum or brief or other written statement in support of your appeal; and |
| (5) | Request to Withdraw your appeal |

No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.

Filing by oral request (for expedited review only):

Oral requests for expedited review of a Part D decision may be made by telephone to (866) 365-8204.  You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review.  The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.  Please note that your request for review will only be expedited if the Part D drug has not already been furnished and the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

How will the Medicare Appeals Council respond to my appeal?
The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented Beneficiary/enrollee.  It may change the parts of the decision that you agree with.  It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action.  It may also dismiss your appeal.
Questions?

You may call or write our office.  A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/.  You can also call the Medicare Appeals Council's staff in the

Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free) if you have questions about filing an appeal.

Enclosures: OMHA-152, Decision

Copies were sent to the following parties and Medicare Contractors:

C2C Innovative Solutions, Inc.
DME QIC Appeals–ALJ
P.O. Box 44006
Jacksonville, FL 32231-4006

ALJ Appeal No. 1-8136495060



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Irvine Field Office**
**Irvine, CA**

| | |
|---|---|
| Appeal of:   **E. Banks** | ALJ Appeal No.:   **1-8136495060** |
| Beneficiary:   **E. Banks** | Medicare: **PART B** |
| HICN:   *****8912A** | Before:   **Bruce Kelton**<br>U.S. Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments presented in the record and at the hearing, an UNFAVORABLE decision is entered in this matter.

### Procedural History

A Medicare claim was submitted to the Medicare Administrative Contractor (MAC) for the date of service, 1/25/2018, 3/12/2018 and 4/12/2018, for Electrical Stimulation Cancer Treatment (referred to as tumor treatment field therapy ("TTFT") that was provided to the above-listed Medicare Beneficiary. The claim was denied for payment at the initial determination and by redetermination by the MAC. (Exh. 1)

In response to the Appellant's appeal of the redetermination, the Qualified Independent Contractor (QIC) issued an unfavorable reconsideration on 9/15/2018. (Exh. 1)

The Appellant timely filed a request for hearing before an Administrative Law Judge (ALJ). The amount in controversy meets the jurisdictional requirement and is based on the billed amount. (Exh. 3)

Following due notice, a hearing was held by phone before the undersigned ALJ on 2/19/2019. (Exh. 4- Notice of Hearing; Hearing CD) The Appellant was represented by counsel, Debra Parrish, Esq. The Appellant agreed with the appeal issues stated by the ALJ. Appellant's witness, Timothy Park, RN, Novocare, Inc. ("Optune" device manufacturer) also provided testimony at the hearing. All documents were received without objection into the evidentiary record. (Hearing CD)

### Issues

1. Whether Medicare coverage requirements are met for the Electrical Stimulation Cancer Treatment, CPT code E0766, that is, whether payment can be made for those services under Title XVIII of the Social Security Act.

2. In the event that the claims are not payable under Title XVIII of the Act, do the limitation of liability provisions of section 1879 of the Act apply and, if so, to whom.

### Findings of Fact

The record establishes the following facts by a preponderance of the evidence:

The Beneficiary, a 72-year old male, received Electrical Stimulation Cancer Treatment (Tumor Treatment Field Therapy (TTFT) delivered by device, Optune device/NovoTTF-100A System, for treatment for glioblastoma. He was initially diagnosed with glioblastoma grade IV in September, 2009. He has received radiation therapy and concurrent chemotherapy from 10/08/09 to 11/18/09 followed by maintenance chemotherapy. MRI in February, 2010 indicated stable condition, followed by a new area of tumor progression as seen on an MRI of 9/20/2011. The Beneficiary's last chemotherapy was on 11/18/2014. He started to use the Optune device on 12/20/2013. (Exh. 2, pp 13, 24).

The medical record includes physician's notes from 2017 to 2018. The progress notes of 2/8/2018 indicates the Beneficiary has been stable without tumor recurrence. (Exh. 2, pp 1-31, in particular p 10, 23).

The letter of medical necessity indicates the Beneficiary has history of glioblastoma multiforme (GBM). Patients suffering from recurrent GBM has limited treatment options, and Optune is currently the only chronic treatment option with established survival benefit. (Exh. 2, pp 211-Letter of Medical Necessity from the Univ. of Alabama at Birmingham)

Optune/NovoTTF-100A System delivers Tumor Treatment Field Therapy (TTFT) that disrupts and corrupts the division of cancer cells and leads to the death of such cells. (Exh. 2, pp 101: NovoTTF-100A System product manual).

The Appellant billed the subject procedure, TTFT, with designated CPT code E0776. The MAC and the QIC denied coverage pursuant to Local Coverage Determination, LCD L34823 indicates TTFT as not reasonable and necessary. The LCD in place at the time of the subject services can be accessed by following this link: <u>LCD L34823</u> (Exh. 1-Redetermination, Reconsideration).

The Proposed LCD 34823 which is currently in the Comment Period, can be accessed by following this link: <u>Proposed LCD L34823; https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=34823&ver=14&DocID=L34823&bc=gAAAABAAAAAA&</u> The proposed LCD provides coverage of TTFT for newly diagnosed Glioblastoma Multiforme (GBM) if it meets all the program requirements including "reasonable and necessary" criteria under the LCD. Tumor treatment field therapy (E0766) will be denied as not reasonable and necessary for the treatment of recurrent GBM.

## Legal Framework

I. Administrative Law Judge Review Authority

A. Jurisdiction

An individual who, or an organization that, is dissatisfied with the reconsideration of an initial determination is entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner. Social Security Act (Act) § 1869(b)(1)(A).

In implementing this statutory directive, the Secretary has delegated his authority to administer the nationwide hearings and appeals system for the Medicare program to OMHA. See 70 Fed. Reg. 36386, 36387 (June 23, 2005). The ALJ's within OMHA issue the final decisions of the Secretary, except for decisions reviewed by the Medicare Appeals Council. Id.

In 2012, a hearing before an ALJ was only available if the remaining amount in controversy was $130 or more. See 42 C.F.R. § 405.1006(b)(1). The request for hearing is timely if filed within sixty days after receipt of the notice of the Qualified Independent Contractor's (QIC's) reconsideration. See 42 C.F.R. § 405.1002(a)(1).

B. Scope of Review

Under the Centers for Medicare and Medicaid Services' (CMS) implementation policy for the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), Pub. Law 106-554, Appellant. F, 114 Stat. 2763, 2763A-463, and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Pub. Law 108-173, 117 Stat. 2066, all initial determinations by CMS-contracted carriers prior to January 1, 2006, are governed by the ALJ hearing procedures set forth at 20 C.F.R. §§ 404.929 through 404.961 and 42 C.F.R. § 405.855. See 70 Fed. Reg. 11420, 11424-26 (Mar. 8, 2005).

"The issues before the administrative law judge include all the issues brought out in the initial, reconsidered or revised determination that were not decided entirely in [the Appellant's] favor. However, if evidence presented before or during the hearing causes the administrative law judge to question a fully favorable determination, he or she will notify [the Appellant] and will consider it an issue at the hearing." 20 C.F.R. § 404.946(a).

"The administrative law judge may decide a case on the record and not conduct an oral hearing if [the Appellant] and all the parties indicate in writing that [they] do not wish to appear before the administrative law judge at an oral hearing." 20 C.F.R. § 404.948(b)(i).

C. Standard of Review

"The [Office of Medicare Hearings and Appeals]…is staff[de] with Administrative Law Judges who conduct 'de novo' hearings…." 70 Fed. Reg. 36386 (June 23, 2005); see also In re Atlantic Anesthesia Associates, P.C., MAC (June 2004) ("An ALJ qualified and appointed pursuant to the Administrative Procedure Act acts as an independent finder of fact in conducting a hearing pursuant to section 1869 of the Act. This requires de novo consideration of the facts and law.").

## II. Principles of Law

### A. Statutes and Regulations

Title XVIII of the Social Security Act ("the Act"), as amended, establishes a federally subsidized health insurance program ("Medicare") to be administered by the Department of Health and Human Services. Eligibility for Medicare benefits is determined under Title XVIII of the Act, 42 U.S.C. § 1801 et seq., and federal regulations set forth in Title 42 of the Code of Federal Regulations (C.F.R.).

Medicare Part A entitles a Beneficiary to reimbursement for a variety of costs associated with hospital, related post-hospital, home health services, and hospice care for individuals eligible for Medicare. Section 1812(a)(1). Medicare Part B establishes a voluntary program of supplemental medical insurance covering physicians' charges and other medical services. (See Sections 1831, 1832, and 1861(s); 42 C.F.R. § 410(40)(a)(2)).

Sections 1812 and 1813 of the Act establish the scope of benefits of the hospital insurance program under Medicare Part A. Sections 1813, 1814, 1815, 1816, and 1817 of the Act set forth the conditions of and limitations on payment for services under Part A of Medicare. Medicare Part A benefits include payment for hospital services.

Section 1833(e) of the Act specifies that claims for payment must be supported by sufficient information and documentation. The provider, supplier, or Beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. See also 42 C.F.R § 424.5(a)(6).

Section 1862(a)(1)(A) of the Act provides that no payment may be made under Medicare Part A or Part B for any expenses incurred for items or services that are "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." See also Section 1862(a)(1)(A) of the Act, 42 C.F.R. § 411.15(k)(1)).

Section 1879 of the Act provides that when Medicare coverage and payment is excluded pursuant to Section 1862(a)(1) of the Act, payment may nevertheless be made for items or services, if neither the Beneficiary nor the provider or supplier knew, and could not reasonably be expected to have known, that the items or services would not be covered or payable by Medicare. See also 42 C.F.R. § 411.406.

### B. Policy and Guidance

Section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program unless it is promulgated as a regulation by CMS. However, although not subject to the force and effect of the law, CMS and its contractors, have issued policy and guidelines that describe criteria for coverage for selected types of medical services and supplies.

Also considered are the manuals and rulings issued by the Centers for Medicare and Medicaid Services (CMS) in implementing the Medicare program. Although not binding on the ALJ, the

respective manuals provide guidance in the administration of the Medicare program. Shalala v. Guernsey Memorial Hospital, 514 U.S. 87 (1995). The Court concluded that an agency manual section is a valid interpretive rule and also found that it is reasonable for the agency to follow it. Id. at 102.

Medicare Program Integrity Manual ("MPIM"), Pub. 100-08, Ch.13.1.1 provides that an LCD, as defined in §1869(f)(2)(B) of the Social Security Act (SSA), is a determination by a Medicare Administrative Contractor (MAC) respecting whether or not a particular item or service is covered on a contractor–wide basis in accordance with section 1862(a)(1)(A) of the Act. 1869(f)(2)(A) of the SSA outlines the process for Administrative Law Judge (ALJ) and Department of Appeals Board (DAB) review of LCDs. This process is known as the LCD Challenge Process. Procedures related to this challenge process are described in 42 Code of Federal Regulation (CFR) part426.

1869 (f)(2)(A) provides as follows:

(2) Local coverage determination.—

(A)  In General.—Review of any local coverage determination shall be subject to the following limitations:

(i) Upon the filing of a complaint by an aggrieved party, such a determination shall be reviewed by an administrative law judge. The administrative law judge.—
(I) shall review the record and shall permit discovery and the taking of evidence to evaluate the reasonableness of the determination, if the administrative law judge determines that the record is incomplete or lacks adequate information to support the validity of the determination;
(II) may, as appropriate, consult with appropriate scientific and clinical experts; and
(III) shall defer only to the reasonable findings of fact, reasonable interpretations of law, and reasonable applications of fact to law by the Secretary.
(ii) Upon the filing of a complaint by an aggrieved party, a decision of an administrative law judge under clause (i) shall be reviewed by the Departmental Appeals Board of the Department of Health and Human Services.
(iii) The Secretary shall implement a decision of the administrative law judge or the Departmental Appeals Board within 30 days of receipt of such decision.
(iv) A decision of the Departmental Appeals Board constitutes a final agency action and is subject to judicial review.

42 CFR § 405.1062 provides for applicability of local coverage determinations (LCD) and other policies that are not binding on the Administrative Law Judge (ALJ) and Medicare Appeals Council (MAC) as follows:

(a) ALJs and the MAC are not bound by LCDs, LMRPs, or CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case.
(b) If an ALJ or MAC declines to follow a policy in a particular case, the ALJ or MAC decision must explain the reasons why the policy was not followed. An ALJ or MAC decision to disregard such policy applies only to the specific claim being considered and does not have precedential effect.
(c) An ALJ or MAC may not set aside or review the validity of an LMRP or LCD for

purposes of a claim appeal. An ALJ or the DAB may review or set aside an LCD (or any part of an LMRP that constitutes an LCD) in accordance with part 426 of this title.

MPIM, Pub. 100-08, Ch. 13, Section 13.3 - LCD Reconsideration Process (Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)

The LCD reconsideration process is a mechanism by which a beneficiary or stakeholder (including a medical professional society or physician) in the MAC's jurisdiction can request a revision to an LCD. The LCD reconsideration process differs from an initial request for an LCD in that it is available only for final effective LCDs. The whole LCD or any provision of the LCD may be reconsidered. In addition, MACs have the discretion to revise or retire their LCDs at any time on their own initiative.

13.3.1 - Web site Requirements for the LCD Reconsideration Process
(Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)
MACs shall add to their MAC Web sites information on the LCD Reconsideration Process. This information should be on the LCD home page of the MAC's Web site. It shall be labeled "LCD Reconsideration Process" and shall include:
• A description of the LCD Reconsideration Process; and
• Instructions for submitting LCD reconsideration requests, including postal, e-mail, and fax addresses where requests may be submitted.

13.3.2 - Valid LCD Reconsideration Request Requirements
(Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)
MACs shall consider all LCD reconsideration requests from:
• Beneficiaries residing or receiving care in a contractor's jurisdiction; and
• Providers doing business in a contractor's jurisdiction.
• Any interested party doing business in a contractor's jurisdiction.
MACs should only accept reconsideration requests for LCDs published as an effective final. Requests shall not be accepted for other documents including:
• National Coverage Determinations (NCDs);
• Coverage provisions in interpretive manuals;
• Proposed LCDs;
• Template LCDs, unless or until they are adopted and in effect by the contractor;
• Retired LCDs;
• Individual claim determinations
• Bulletins, articles, training materials; and
• Any instance in which no LCD exists, i.e., requests for development of an LCD.
If modification of the LCD would conflict with an NCD, the request would not be valid. The MAC should refer the requestor to the NCD reconsideration process. Requestors can be referred to http://www.cms.gov/DeterminationProcess/01_overview.asp#regs.
Requests shall be submitted in writing and shall identify the language that the requestor wants added to or deleted from an LCD. Requests shall include a justification supported by new evidence, which may materially affect the LCD's content or basis. Copies of published evidence shall be included. Any request for LCD reconsideration that, after MAC review, is determined to not meet these criteria is invalid. MACs have the discretion to consolidate valid requests if similar requests are received.

13.3.3 - Process Requirements

(Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)
The requestor shall submit a valid LCD reconsideration request to the appropriate MAC, following instructions on the MAC's Web site.
Within 60 calendar days of the day the request is received, the MAC shall determine whether the request is valid or invalid. If the request is invalid, the contractor shall respond, in writing, to the requestor explaining why the request was invalid. If the request is valid, the contractor shall follow the requirements below.
The MAC shall open the LCD and follow the LCD process as outlined in section 13.2 of this manual or include the LCD on the MAC's waiting list. The MAC shall respond, in writing, to the requestor notifying the requestor of the acceptance, and if applicable, wait-listing, of the reconsideration request.
Contractors shall keep an internal list of the LCD Reconsideration Requests received and the dates, subject, and disposition of each one.

## 13.4 - Challenge of an LCD

(Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)
In addition to creating the term "Local Coverage Determination" (LCD), section 1869(f) of the Social Security Act creates an appeals process for an "aggrieved party" to challenge LCDs/LCD provisions that are in effect at the time of the challenge. "Aggrieved party" is defined in regulation as a Medicare beneficiary, or the estate of a Medicare beneficiary, who is entitled to benefits under Part A, enrolled under Part B, or both (including an individual enrolled in fee-for-service Medicare, in a Medicare Advantage plan (MA), or in another Medicare managed care plan), and is in need of coverage for an item or service that would be denied by an LCD, as documented by the beneficiary's treating physician, regardless of whether the service has been received. An aggrieved party has obtained documentation of the need by the beneficiary's treating physician.
Contractors shall follow all LCD Challenge requirements outlined in 42 CFR part 426. As indicated in 42 CFR § 426.415 if appropriate, CMS may choose to participate as a party in the LCD Challenge process.

**MPIM, Pub. 100-08, Ch. 13, Section 13.5.1 - General Requirements.** The Medicare Coverage Database (MCD) is the central repository that houses proposed, and final LCDs, and LCD related articles.
• The MACs shall publish all proposed and final LCDs and LCD related articles on the MCD. The public may access the MCD at http://www.cms.gov/medicare-coverage-database.
• MACs must ensure the accuracy of the information entered into the MCD.
• If a MAC decides to have LCDs and related articles on their MAC web sites, then the MAC must link from their MAC website to the MCD.
MACs shall finalize or retire all proposed LCDs within a rolling year of publication date of the proposed LCD on the MCD (365 days). If an unusual circumstance occurs and the MAC wishes to request an exception to this requirement, they shall notify their COR and LCD BFLs at least 21 business days before the one year expiration date.
The MAC shall ensure that all LCDs do not conflict with all statutes, rulings, regulations, and national coverage, payment, and coding policies.

## 13.5.4 – Reasonable and Necessary Provisions in LCDs (Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)

An item or service may be covered by a contractor LCD if:

• It is reasonable and necessary under 1862(a)(1)(A) of The Act. Only reasonable and necessary provisions are considered part of the LCD.

Reasonable and Necessary

Contractors shall determine and describe in the LCD the circumstances under which the item or service is reasonable and necessary under 1862(a)(1)(A). Contractors shall determine if evidence exist to consider an item or service to be reasonable and necessary if the contractor determines that the service is:

• Safe and effective;

• Not experimental or investigational (exception: routine costs of qualifying clinical trial services with dates of service on or after September 19, 2000 which meet the requirements of the Clinical Trials NCD are considered reasonable and necessary); and

• Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:

o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;

o Furnished in a setting appropriate to the patient's medical needs and condition;

o Ordered and furnished by qualified personnel;

o One that meets, but does not exceed, the patient's medical need; and

o At least as beneficial as an existing and available medically appropriate alternative.

13.5.5 - Public Comment (Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)

MACs are required to provide a minimum of 45 calendar days for public comment on all proposed LCDs. MACs shall respond to all timely received public comments, and may group similar comments and responses in logical categories in the RTC article.

13.5.6 - Final Decision (Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)

MACs shall finalize or retire all proposed LCDs within a rolling year of publication date of the proposed LCD on the MCD (365 days). After the close of the comment period and the required meetings, the MACs shall publish a final LCD to the MCD. MACs shall link from their contractor website to the final LCD on the MCD. As stated earlier, the MAC shall also respond to all comments received, via the RTC article which shall be published on the MCD and be related to the LCD. The RTC article shall be displayed at the same time as the final LCD.

MACs shall notify the public that a final decision has been published and provide the Web link to the final decision. MACs may use several tools at their disposal to educate providers, including the "What's New Report" on the Medicare Coverage Database, setting up email listservs, or other 508 compliant and accessible means to inform stakeholders.

13.6 - LCD Record (Rev: 854; Issued: 01-11-19; Effective: 09-26-18; Implementation: 01-08-19)

The LCD record shall be maintained by contractors for a minimum of 6 years and 3 months from the date the LCD is retired. Contractors shall have a mechanism for archiving retired LCDs. This mechanism shall also allow the contractor to respond to requests and retrieve the LCD record. After 6 years and 3 months from the date the LCD is retired, the LCD record shall be destroyed. However, contractors shall not destroy the LCD record if it relates to a current investigation of litigation/negotiation; ongoing Workers' Compensation set aside arrangements; or documents which prompt suspicions of fraud and abuse of items or services. This will satisfy evidentiary needs and discovery obligations critical to the agency's litigation interests.

MPIM, Pub. 100-08, Ch. 5, Section 5.7 – Documentation in the Patient's Medical Record. For any DMEPOS item to be covered by Medicare, the patient's medical record must contain sufficient documentation of the patient's medical condition to substantiate the necessity for the type and quantity of items ordered and for the frequency of use or replacement (if applicable). The information should include the patient's diagnosis and other pertinent information including, but not limited to, duration of the patient's condition, clinical course (worsening or improvement), prognosis, nature and extent of functional limitations, other therapeutic interventions and results, past experience with related items, etc. If an item requires a CMN or DIF, it is recommended that a copy of the completed CMN or DIF be kept in the patient's record. However, neither a physician's order nor a CMN nor a DIF nor a supplier prepared statement nor a physician attestation by itself provides sufficient documentation of medical necessity, even though it is signed by the treating physician or supplier. There must be information in the patient's medical record that supports the medical necessity for the item and substantiates the answers on the CMN (if applicable) or DIF (if applicable) or information on a supplier prepared statement or physician attestation (if applicable).

The proposed LCD L 34823, in pertinent, provides as follows (MCD is located at http://www.cms.gov/medicare-coverage-database):

INITIAL COVERAGE FOR NEWLY DIAGNOSED GLIOBLASTOMA MULTIFORME:

Tumor treatment field therapy (E0766) is only covered for the treatment of newly diagnosed Glioblastoma Multiforme (GBM) when all of the following criteria are met:

1. The beneficiary has histologically confirmed (World Health Organization (WHO) grade IV astrocytoma), newly diagnosed, supratentorial GBM; and,
2. The beneficiary has received initial treatment with maximal debulking surgery, followed by chemotherapy and radiotherapy; and,
3. Tumor treatment field therapy is initiated within 7 weeks from the last dose of concomitant chemotherapy or radiotherapy; and,
4. The beneficiary is receiving care for GBM at a National Cancer Institute-designated Cancer Center, National Cancer Institute-designated Comprehensive Cancer Center, or National Cancer Institute-designated Cancer Research Network facility; and,
5. The beneficiary has no evidence of progression by Response Assessment in Neuro-Oncology (RANO) criteria; and,
6. The beneficiary has a Karnofsky Performance Score (KPS) of at least 70; and,
7. The beneficiary will use TTFT for at least 18 hours/day.

If all of the coverage criteria above are not met, claims for code E0766 will be denied as not reasonable and necessary.

CONTINUED COVERAGE FOR NEWLY DIAGNOSED GBM BEYOND THE FIRST THREE MONTHS OF THERAPY:

Continued coverage of TTFT (E0766) beyond the first three months of therapy requires that no sooner than the 60th day but no later than the 91st day after initiating therapy, the treating practitioner must conduct a clinical re-evaluation and document that the beneficiary is continuing to use and is benefiting from TTFT.

Documentation of clinical benefit is demonstrated by:

1.Face-to-face clinical re-evaluation by the treating practitioner; and,
2.Objective evidence of adherence to the use of TTFT, reviewed by the treating practitioner. Adherence to therapy is defined as the use of TTFT for at least 18 hrs/day (see criterion 7 above).

If the above criteria are not met, continued coverage of TTFT will be denied as not reasonable and necessary.

If the practitioner re-evaluation does not occur until after the 91st day but the evaluation demonstrates that the beneficiary is benefiting from TTFT as defined in criteria 1 and 2 above, continued coverage of TTFT will commence with the date of that re-evaluation. See Policy Specific Documentation Requirements in the LCD-related Policy Article, located in the Related Local Coverage Documents section of this LCD, for information about KX modifier use.

RECURRENT GBM

Tumor treatment field therapy (E0766) will be denied as not reasonable and necessary for the treatment of recurrent GBM.

OTHER USES

The use of TTFT for any indications other than newly diagnosed GBM will be denied as not reasonable and necessary.

GENERAL

A Detailed Written Order (DWO) (if applicable) must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving a completed DWO, the claim shall be denied as not reasonable and necessary.

An item/service is correctly coded when it meets all the coding guidelines listed in CMS HCPCS guidelines, LCDs, LCD-related Policy Articles, or DME MAC articles. Claims that do not meet coding guidelines shall be denied as not reasonable and necessary/incorrectly coded.

Proof of delivery (POD) is a Supplier Standard and DMEPOS suppliers are required to maintain POD documentation in their files. Proof of delivery documentation must be made available to the Medicare contractor upon request. All services that do not have appropriate proof of delivery from the supplier shall be denied as not reasonable and necessary.

**Analysis**

I. The Tumor Treatment Field Therapy (TTFT) is not covered for treatment of recurrent glioblastoma multiforme (GBM)

The Medicare Administrative Contractor (MAC) denied the claim on the basis that the service billed does not have an LCD that extends coverage for TTFT. The applicable LCD L34823 deems Tumor treatment field therapy (E0766) as not reasonable and necessary for recurrent GBM. The QIC upheld

denial of coverage on the same basis. The QIC further found that currently published studies in the medical literature do not clearly document the effectiveness of this device. Therefore, the QIC found that there is insufficient documentation to quantify the effects of the device at issue. In support of its unfavorable decision, the QIC cited to LCD L34323.

The Appellant argues that patients with recurrent glioblastoma have an expected survival of approximately six months based on medical literature. The Beneficiary attributes that his survival has exceeded this time period due to treatment by TTFT via the Optune device. The Appellant further argues that the published, peer-reviewed literature support improvement in clinical outcome of patients who receive TTFT for their glioblastoma. The treatment is covered by large national payers.

Unfortunately, Medicare does not cover all treatments that may be beneficial to each patient. Medicare follows its coverage guidelines, and the ALJ must give serious deference to the LCD that is effective on the date of service. Pursuant to MPIM, Pub. 100-08, Ch. 13, Section 13.5.1, the ALJ has consulted the Medicare Coverage Database (MCD), the central repository that houses proposed, and final LCDs, and LCD related articles for the most current development on the LCD L 34823 (MCD is located at http://www.cms.gov/medicare-coverage-database.) LCD L34823 that was in place during the dates of service excludes coverage of TTFT. The medical literature that the Appellant has submitted does not justify the ALJ to depart from applying the effective LCD. The LCD clearly states that "Treatment field therapy (E0766) will be denied as not reasonable and necessary." The proposed LCD that is presently in the Comment Period is not considered in this case because it has not been effectuated as of date. The ALJ is required to give substantial deference to the applicable LCD pursuant to 42 CFR § 405.1062. As such, the LCD is clear in excluding coverage of TTFT, so the ALJ must find the claim cannot be covered by Medicare under the LCD L 34823.

II. Limitation of Liability of Section 1879 does not relieve Appellant's financial responsibility.

When reimbursement for a Medicare claim is denied, consideration must also be given to whether payment may nonetheless be made per Section 1879 of the Social Security Act. Section 1879 provides for waiver of liability when services at issue are found to be "not medically reasonable and necessary," or "custodial in nature." In order to allow waiver of liability, Section 1879 requires that: (1) the item or service be furnished under assignment, and (2) neither the Beneficiary, nor the provider/supplier knew or reasonably could have been expected to know that such services would be excluded from Medicare coverage.

Here, the Appellant knew or could reasonably have been expected to know the services provided to the Beneficiary would not be covered under Medicare. The record shows that the Appellant was aware of the Medicare guidelines and requirements because a Provider is presumed to have knowledge of published Medicare coverage rules and regulations, CMS Rulings, Medicare coverage policies in bulletins or websites, and acceptable standards within the local community pursuant 42 C.F.R. §§ 489.2 and 411.406. In this case, the Appellant is in the business of providing medical services to Medicare beneficiaries. Therefore, the Appellant should have known that reimbursement would not be allowed unless all Medicare coverage criteria are met and billed at the appropriate level of care.

On the other hand, the Beneficiary did not know and could not have expected to know the services were excluded from coverage. Appellant did not notify the Beneficiary in writing before the services

were furnished that Medicare would not likely pay for the services based on the given circumstances. There is no evidence that the Beneficiary signed an Advance Beneficiary Notice.

For the reasons stated, Section 1879 does not relieve Appellant's financial liability of the non-covered claim, and the Beneficiary cannot be held responsible for the denied charges.

## Conclusions of Law

It is the decision of the undersigned ALJ that the claim for E0766/Electrical Stimulation Cancer Treatment (aka Tumor Treatment Field Therapy (TTFT)), for date of service of 1/25/2018, 3/12/2018 and 4/12/2018 are not medically reasonable and necessary. Payment is therefore not allowed by Medicare. The decision of the QIC is UPHELD.

The waiver of liability provisions of section 1879 of the Act does not apply to relieve the Provider's financial liability. The Provider remains responsible for the denied charges.

SO ORDERED.

Dated:     JUN 0 3 2019 2019

Bruce J. Kelton
U.S. Administrative Law Judge

# ATTACHMENT 3:

## Proposed LCD for TTFT

# Proposed Local Coverage Determination (LCD):
# Tumor Treatment Field Therapy (TTFT) (DL34823)

Links in PDF documents are not guaranteed to work. To follow a web link, please use the MCD Website.

**Please Note: This is a Proposed policy.**

Proposed LCDs are works in progress that are available on the Medicare Coverage Database site for public review.
Proposed LCDs are not necessarily a reflection of the current policies or practices of the contractor.

# Contractor Information

| CONTRACTOR NAME | CONTRACT TYPE | CONTRACT NUMBER | JURISDICTION | STATE(S) |
|---|---|---|---|---|
| CGS Administrators, LLC | DME MAC | 17013 - DME MAC | J-B | Illinois<br>Indiana<br>Kentucky<br>Michigan<br>Minnesota<br>Ohio<br>Wisconsin |
| CGS Administrators, LLC | DME MAC | 18003 - DME MAC | J-C | Alabama<br>Arkansas<br>Colorado<br>Florida<br>Georgia<br>Louisiana<br>Mississippi<br>North Carolina<br>New Mexico<br>Oklahoma<br>Puerto Rico<br>South Carolina<br>Tennessee<br>Texas<br>Virginia<br>Virgin Islands<br>West Virginia |
| Noridian Healthcare Solutions, LLC | DME MAC | 16013 - DME MAC | J-A | Connecticut<br>District of Columbia<br>Delaware<br>Massachusetts<br>Maryland<br>Maine<br>New Hampshire |

| CONTRACTOR NAME | CONTRACT TYPE | CONTRACT NUMBER | JURISDICTION | STATE(S) |
|---|---|---|---|---|
| | | | | New Jersey<br>New York - Entire State<br>Pennsylvania<br>Rhode Island<br>Vermont |
| Noridian Healthcare Solutions, LLC | DME MAC | 19003 - DME MAC | J-D | Alaska<br>American Samoa<br>Arizona<br>California - Entire State<br>Guam<br>Hawaii<br>Iowa<br>Idaho<br>Kansas<br>Missouri - Entire State<br>Montana<br>North Dakota<br>Nebraska<br>Nevada<br>Oregon<br>South Dakota<br>Utah<br>Washington<br>Wyoming<br>Northern Mariana Islands |

# Proposed LCD Information

## Document Information

**Source LCD ID**

L34823

**Proposed LCD ID**

DL34823

**Original ICD-9 LCD ID**

L34665

L34738

L34730

L34734

**Proposed LCD Title**

Tumor Treatment Field Therapy (TTFT)

**AMA CPT / ADA CDT / AHA NUBC Copyright Statement**

CPT codes, descriptions and other data only are copyright 2018 American Medical Association. All Rights Reserved. Applicable FARS/HHSARS apply.

Current Dental Terminology © 2018 American Dental Association. All rights reserved.

Copyright © 2018, the American Hospital Association, Chicago, Illinois. Reproduced with permission. No portion of the AHA copyrighted materials contained within this publication may be copied without the express written consent of the AHA. AHA copyrighted materials including the UB-04 codes and descriptions may not be removed, copied, or utilized within any software, product, service, solution or derivative work without the written consent of the AHA. If an entity wishes to utilize any AHA materials, please contact the AHA at 312-893-6816. Making copies or utilizing the content of the UB-04 Manual, including the codes and/or descriptions, for internal purposes, resale and/or to be used in any product or publication; creating any modified or derivative work of the UB-04 Manual and/or codes and descriptions; and/or making any commercial use of UB-04 Manual or any portion thereof, including the codes and/or descriptions, is only authorized with an express license from the American Hospital Association. To license the electronic data file of UB-04 Data Specifications, contact Tim Carlson at (312) 893-6816 or Laryssa Marshall at (312) 893-6814. You may also contact us at ub04@healthforum.com.

## CMS National Coverage Policy

N/A

## Coverage Guidance

**Coverage Indications, Limitations, and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements.

The purpose of a Local Coverage Determination (LCD) is to provide information regarding "reasonable and necessary" criteria based on Social Security Act § 1862(a)(1)(A) provisions.

In addition to the "reasonable and necessary" criteria contained in this LCD there are other payment rules, which are discussed in the following documents, that must also be met prior to Medicare reimbursement:

- The LCD-related Standard Documentation Requirements Article, located at the bottom of this policy under the Related Local Coverage Documents section.

- The LCD-related Policy Article, located at the bottom of this policy under the Related Local Coverage Documents section.

- Refer to the Supplier Manual for additional information on documentation requirements.

- Refer to the DME MAC web sites for additional bulletin articles and other publications related to this LCD.

For the items addressed in this LCD, the "reasonable and necessary" criteria, based on Social Security Act § 1862(a)(1)(A) provisions, are defined by the following coverage indications, limitations and/or medical necessity.

INITIAL COVERAGE FOR NEWLY DIAGNOSED GLIOBLASTOMA MULTIFORME:

Tumor treatment field therapy (E0766) is only covered for the treatment of newly diagnosed Glioblastoma Multiforme (GBM) when all of the following criteria are met:

1. The beneficiary has histologically confirmed (World Health Organization (WHO) grade IV astrocytoma), newly diagnosed, supratentorial GBM; and,

2. The beneficiary has received initial treatment with maximal debulking surgery, followed by chemotherapy and radiotherapy; and,

3. Tumor treatment field therapy is initiated within 7 weeks from the last dose of concomitant chemotherapy or radiotherapy; and,

4. The beneficiary is receiving care for GBM at a National Cancer Institute-designated Cancer Center, National Cancer Institute-designated Comprehensive Cancer Center, or National Cancer Institute-designated Cancer Research Network facility; and,

5. The beneficiary has no evidence of progression by Response Assessment in Neuro-Oncology (RANO) criteria; and,

6. The beneficiary has a Karnofsky Performance Score (KPS) of at least 70; and,

7. The beneficiary will use TTFT for at least 18 hours/day.

If all of the coverage criteria above are not met, claims for code E0766 will be denied as not reasonable and necessary.

CONTINUED COVERAGE FOR NEWLY DIAGNOSED GBM BEYOND THE FIRST THREE MONTHS OF THERAPY:

Continued coverage of TTFT (E0766) beyond the first three months of therapy requires that no sooner than the 60th day but no later than the 91st day after initiating therapy, the treating practitioner must conduct a clinical re-

evaluation and document that the beneficiary is continuing to use and is benefiting from TTFT.

Documentation of clinical benefit is demonstrated by:

1. Face-to-face clinical re-evaluation by the treating practitioner; and,

2. Objective evidence of adherence to the use of TTFT, reviewed by the treating practitioner.

Adherence to therapy is defined as the use of TTFT for at least 18 hrs/day (see criterion 7 above).

If the above criteria are not met, continued coverage of TTFT will be denied as not reasonable and necessary.

If the practitioner re-evaluation does not occur until after the 91st day but the evaluation demonstrates that the beneficiary is benefiting from TTFT as defined in criteria 1 and 2 above, continued coverage of TTFT will commence with the date of that re-evaluation. See Policy Specific Documentation Requirements in the LCD-related Policy Article, located in the Related Local Coverage Documents section of this LCD, for information about KX modifier use.

RECURRENT GBM

Tumor treatment field therapy (E0766) will be denied as not reasonable and necessary for the treatment of recurrent GBM.

OTHER USES

The use of TTFT for any indications other than newly diagnosed GBM will be denied as not reasonable and necessary.

GENERAL

A Detailed Written Order (DWO) (if applicable) must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving a completed DWO, the claim shall be denied as not reasonable and necessary.

An item/service is correctly coded when it meets all the coding guidelines listed in CMS HCPCS guidelines, LCDs, LCD-related Policy Articles, or DME MAC articles. Claims that do not meet coding guidelines shall be denied as not reasonable and necessary/incorrectly coded.

Proof of delivery (POD) is a Supplier Standard and DMEPOS suppliers are required to maintain POD documentation in their files. Proof of delivery documentation must be made available to the Medicare contractor upon request. All services that do not have appropriate proof of delivery from the supplier shall be denied as not reasonable and necessary.

**Summary of Evidence**

Support for TTFT in the treatment of newly diagnosed GBM stems from a study by Stupp et al. (2017), also referred to as the EF-14 study. The EF-14 study was a randomized, open-label trial of 695 patients with histologically-

confirmed glioblastoma multiforme (World Health Organization (WHO) grade IV astrocytoma) whose tumor was resected or biopsied and had completed concomitant radiochemotherapy and TTFT. Of the 695 randomized patients, 637 (92%) completed the trial. Median progression-free survival from randomization was 6.7 months in the TTFT-temozolomide group vs 4.0 months in the temozolomide-alone group (HR, 0.63; 95% CI, 0.52-0.76; P < .001). Median overall survival was 20.9 months in the TTFT-temozolomide group vs 16.0 months in the temozolomide-alone group (HR, 0.63; 95% CI, 0.53-0.76; P < .001). Systemic adverse events were similar between the two study arms. Mild to moderate skin toxicity underneath the transducer arrays occurred in 52% of patients who received TTFT-temozolomide vs no patients who received temozolomide alone.

The *National Comprehensive Cancer Network* assigns TTFT a Category 1 recommendation as an option for newly diagnosed GBM.


**Analysis of Evidence**
**(Rationale for Determination)**


*Background*

Alternating electric fields are produced by a pulse generator and transmitted by ceramic transducers placed on a patient's head. Tumor Treatment Field Therapy (TTFT) uses alternating electric fields to target cancer cells. The electric fields reportedly attract and repel charged proteins during cancer cell division. Cellular proteins, because they are highly polarized, are presumed to be prevented from moving to their correct locations thus disrupting cancer cell division.

Glioblastoma, also known as glioblastoma multiforme (GBM) is an aggressive type of brain cancer. It is rare, with an incidence of 3.21 cases per 100,000 population per year in the US. Tumor Treatment Field Therapy is an additional option to standard surgical, chemotherapy, and radiotherapy treatment modalities for the treatment of newly diagnosed GBM.

**NEWLY DIAGNOSED GBM**

In October 2015 the FDA expanded the marketing indications for TTFT to include newly diagnosed GBM (see https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P100034S013). In 2018 the DME MACs received a request to cover TTFT for newly diagnosed GBM. The request for coverage of newly diagnosed GBM is the subject of this proposed LCD.

*Contractor Advisory Committee (CAC)*

Following an independent review of the literature, the DME MACs assembled a 13-member specialty-focused CAC, comprised of a national panel of neuro-oncologists, neurosurgeons and experts in the field of oncologic treatment. The CAC meeting was held on March 6, 2019 in Baltimore, Maryland. Five (5) Key Questions were discussed by the CAC members, and confidence in each Key Question scored (Chair and Industry Representative were excluded from scoring). Confidence was rated on a scale of 1-5, with 1 indicative of low confidence and 5 indicating high confidence.

The following is a summary of the CAC Panel scoring for each Key Question and the related discussion.

1.  **How confident are you that there is sufficient evidence to determine that TTFT for newly diagnosed GBM can provide net positive health outcomes in the Medicare-eligible population?**

    **Scoring Member Average**

    *1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence*   **3.82**

The members noted that both Progression Free Survival (PFS) and Overall Survival (OS) were both increased in the EF-14 treatment arm, and migrated together, for both Medicare age eligible and non-eligible populations, in spite of the small group of the latter. Comments were made as to what constitutes adequate PFS and OS, and there was acknowledgement that additional months of improved quality of life in a disease such as GBM is a desirable outcome.

Several substantial concerns were raised in regard to net positive health outcomes. Two were related to study design, one to the philosophical approach to assessment of a new technology, and one to concerns related to conflicts of interest. In spite of the relative consensus on the goodness of metrics to reflect positive health outcomes, significant concerns were expressed at the study design, lack of sham control group and data gaps regarding volume of study subjects, subset analyses and the lack of corroborative additional clinical study. There was also discussion but not consensus as to whether or not the bar should be higher for net positive health outcomes for such a new technology. Additional concerns were related to the lack of clarity regarding clinical mechanism of action and concerns regarding delivery and dose effect, and geographical localization of the treatment field. Concerns related to potential conflict of interest in study funding and analyses were also discussed.

2.  **How confident are you that the available evidence demonstrates adequate predictors of success in Medicare-eligible population?**

    **Scoring Member Average**

    *1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence*   **3.45**

When considering this question, there was repeated discussion of volume and data gaps. The most substantial concern revolved around the smallness of the Medicare age eligible subpopulation. There was consensus that predictors of response in the age eligible Medicare population were sparse.

3.  **How confident are you that TTFT is generally accepted by the medical community for newly diagnosed GBM?**

    **Scoring Member Average**

    *1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence*   **2.91**

This question generated the most concerns regarding how the standard of care was established, how the provider community was defined and segmented, and what conflicts may contribute to drive adoption. There was consensus that guidelines are just one factor in the determination as to whether TTF is generally accepted in the medical community.

In balance the group did think that regardless of how practitioners were notified of the availability of TTF for GBM, there was broad superficial penetration in the USA community, but

that its acceptance as standard of care or generally accepted practice was not clear.

| 4. | How confident are you that scientific evidence supports mitotic spindle disruption and cellular apoptosis as the mechanism of action of TTFT? | Scoring Member Average |
|----|----|----|
| | *1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence* | **3.27** |

There was discussion here as to the lack of actual human data to demonstrate the mechanism of action, but consensus that there was a plethora of preclinical data did uniformly seem to demonstrate mitotic spindle disruption and apoptosis as a mechanism of action of tumor cell death.

| 5. | How confident are you that there are no significant evidence gaps that may impact positive health outcomes in the Medicare-eligible population? | Scoring Member Average |
|----|----|----|
| | *1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence* | **2.91** |

There was consensus in the group that there remained significant gaps in evidence that the CAC members would like to see explored, either through controlled trials or in a real world evidence study paradigms. There was consensus that more data is needed to identify the place of TTFT in therapy across a more broad range of patient population and within the treatment algorithm for GBM and to further explore its mechanism of action, prognostic features, and predictors of response.

There was discussion of the need to review the evolving evidence rapidly since the standard of care evolves so rapidly in this area. There was consensus that more data is needed to identify the place of TTFT in therapy across a more broad range of patient population and within the treatment algorithm for GBM and to further explore its mechanism of action, prognostic features, and predictors of response. Specific additional areas recommended for study included:

- Dose density and power
- Demographic diversity of subjects
- Prognostic indicators
- Impact on caretakers
- More on quality of life
- Medical economic assessment
- The best sequencing of treatment including where in the algorithm is TTFT best placed
- Exploration of the human mechanism of action

CONCLUSION

The use of TTFT for the treatment of newly diagnosed GBM appears to be gaining acceptance in the neuro-oncology community in the United States. However, there are evidence gaps that preclude unreserved support for the use of TTFT in the treatment of newly diagnosed GBM in Medicare beneficiaries. Thus, the DME MACs are recommending coverage of TTFT only when Medicare beneficiaries are receiving their GBM care at a National Cancer Institute-designated Cancer Center, National Cancer Institute-designated Comprehensive Cancer Center, or National Cancer Institute-designated Cancer Research Network facility, in order to ensure optimal management of Medicare-eligible beneficiaries in a field with rapidly changing treatment armamentariums.

## RECURRENT GBM

In April 2011 the Food and Drug Administration (FDA) approved the marketing of the NovoTTF-100A (later rebranded Optune®) for the treatment of recurrent GBM. The current LCD for TTFT was effective in August 2014, following an Open Meeting and solicitation of public comments. The DME MACs determined that, based on the strength and quality of the evidence available at that time, TTFT was not reasonable and necessary for the treatment of GBM.

In 2018 the DME MACs received a request to reconsider the decision on recurrent GBM. The requestor, Novocure, did not submit new evidence in support of revised coverage for recurrent disease. Consequently, pursuant to Chapter 13 of the CMS Internet Only Manual 100-08, the DME MACs determined that the request was invalid.

# Proposed Process Information

## Synopsis of Changes

| CHANGES | FIELDS CHANGED |
|---------|----------------|
| N/A | N/A |

**Associated Information**

**DOCUMENTATION REQUIREMENTS**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." It is expected that the beneficiary's medical records will reflect the need for the care provided. The beneficiary's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

**GENERAL DOCUMENTATION REQUIREMENTS**

In order to justify payment for DMEPOS items, suppliers must meet the following requirements:

- Prescription (orders)
- Medical Record Information (including continued need/use if applicable)
- Correct Coding
- Proof of Delivery

Refer to the LCD-related Standard Documentation Requirements article, located at the bottom of this policy under

the Related Local Coverage Documents section for additional information regarding these requirements.

Refer to the Supplier Manual for additional information on documentation requirements.

Refer to the DME MAC web sites for additional bulletin articles and other publications related to this LCD.

## POLICY SPECIFIC DOCUMENTATION REQUIREMENTS

Items covered in this LCD have additional policy-specific requirements that must be met prior to Medicare reimbursement.

Refer to the LCD-related Policy article, located at the bottom of this policy under the Related Local Coverage Documents section for additional information.

## Appendices

## Utilization Guidelines

Refer to Coverage Indications, Limitations and/or Medical Necessity

## Sources of Information

Stupp R, Taillibert S, Kanner A, et al. Effect of Tumor-Treating Fields Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma: A Randomized Clinical Trial. *JAMA*. 2017;318(23):2306. doi:10.1001/jama.2017.18718

Food and Drug Administration. Summary of Safety and Effectiveness Data. PMA P100034/S013. Novocure TTF-100A. October 5, 2015.

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. NCCN Evidence Blocks™. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

## Bibliography

*The following bibliography was provided to the Contractor Advisory Committee (CAC) for their consideration of Tumor Treatment Field Therapy for the treatment of newly diagnosed glioblastoma multiforme.*

Submitted by Novocure with Reconsideration Request

Stupp R, Taillibert S, Kanner A, et al. Maintenance Therapy With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone for Glioblastoma: A Randomized Clinical Trial. *JAMA*. 2015;314(23):2535-2543. doi: 10.1001/jama.2015.16669

Stupp R, Taillibert S, Kanner A, et al. Effect of Tumor-Treating Fields Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma: A Randomized Clinical Trial. *JAMA*. 2017;318(23):2306. doi:10.1001/jama.2017.18718

Taphoorn MJB, Dirven L, Kanner AA, et al. Influence of Treatment With Tumor-Treating Fields on Health-Related Quality of Life of Patients With Newly Diagnosed Glioblastoma: A Secondary Analysis of a Randomized Clinical Trial. *JAMA Oncology*. 2018;4(4):495. doi:10.1001/jamaoncol.2017.5082

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. NCCN Flash Card™. Version 1.2018 March 20, 2018.


Provided by DME MACs

Batchelor T, Shih HA, Wen PY. Management of glioblastoma in older adults *UpToDate*. Waltham, Ma.: UpToDate; 2017. https://www.uptodate.com/contents/management-of-glioblastoma-in-older-adults. Accessed April 23, 2018.

Bhandari M. Comparative Study of Adjuvant Temozolomide six Cycles Versus Extended 12 Cycles in Newly Diagnosed Glioblastoma Multiforme. *Journal Of Clinical And Diagnostic Research*. 2017. doi:10.7860/JCDR/2017/27611.9945

Clughesy TF, Lassman AB. NovoTTF: where to go from here? *Neuro-Oncology*. 2017;19(5):605-608. doi: 10.1093/neuonc/nox014

Food and Drug Administration. Novocure Submission to Neurological Devices Panel. NovoTTF-100A. March 17, 2011.

Food and Drug Administration. Summary of Safety and Effectiveness Data. PMA P100034. Novocure TTF-100A. April 8, 2011.

Food and Drug Administration. Summary of Safety and Effectiveness Data. PMA P100034/S013. Novocure TTF-100A. October 5, 2015. Accessed June 23, 2016.

Kesari S, Ram Z, on behalf of EF-14 Trial Investigators. Tumor-treating fields plus chemotherapy versus chemotherapy alone for glioblastoma at first recurrence: a *post hoc* analysis of the EF-14 trial. *CNS Oncology*. 2017;6(3):185-193. doi:10.2217/cns-2016-0049

Kirson ED, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proceedings of the National Academy of Sciences*. 2007;104(24):10152-10157. doi: 10.1073/pnas.0702916104

Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of Cancer Cell Replication by Alternating Electric Fields. *Cancer Research*. 2004;64(9):3288-3295. doi: 10.1158/0008-5472.can-04-0083

Martínez-Garcia M, Álvarez-Linera J, Carrato C, et al. SEOM clinical guidelines for diagnosis and treatment of glioblastoma (2017). *Clinical and Translational Oncology*. 2018;20(1):22-28. doi:10.1007/s12094-017-1763-6

Mehta M, Wen P, Nishikawa R, Reardon D, Peters K. Critical review of the addition of tumor treating fields (TTFields) to the existing standard of care for newly diagnosed glioblastoma patients. *Critical Reviews in Oncology/Hematology*. 2017;111:60-65. doi:10.1016/j.critrevonc.2017.01.005

Mittal S, Klinger NV, Michelhaugh SK, Barger GR, Pannullo SC, Juhász C. Alternating electric tumor treating fields for treatment of glioblastoma: rationale, preclinical, and clinical studies. *Journal of Neurosurgery*. February 2018:414-

421. doi:10.3171/2016.9.JNS16452

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. NCCN Evidence Blocks™. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

Palmer JD, Bhamidipati D, Mehta M, et al. Treatment recommendations for elderly patients with newly diagnosed glioblastoma lack worldwide consensus. *Journal of Neuro-Oncology*. 2018;140(2):421-426. doi:10.1007/s11060-018-2969-3

Sampson JH. Alternating Electric Fields for the Treatment of Glioblastoma. *JAMA*. 2015;314(23):2511. doi:10.1001/jama.2015.16701

Sulman EP, Ismaila N, Armstrong TS, et al. Radiation Therapy for Glioblastoma: American Society of Clinical Oncology Clinical Practice Guideline Endorsement of the American Society for Radiation Oncology Guideline. *Journal of Clinical Oncology*. 2017;35(3):361-369. doi:10.1200/JCO.2016.70.7562

Toms SA, Kim CY, Nicholas G, Ram Z. Increased compliance with tumor treating fields therapy is prognostic for improved survival in the treatment of glioblastoma: a subgroup analysis of the EF-14 phase III trial. 2018 141:467–473. Doi: 10.1007/s11060-018-03057-z

Weller M, van den Bent M, Tonn JC, et al. European Association for Neuro-Oncology (EANO) guideline on the diagnosis and treatment of adult astrocytic and oligodendroglial gliomas. *The Lancet Oncology*. 2017;18(6):e315-e329. doi:10.1016/S1470-2045(17)30194-8

Wick W. TTFields: where does all the skepticism come from? *Neuro-Oncology*. 2016;18(3):303-305. doi:10.1093/neuonc/now012

Wick W, Osswald M, Wick A, Winkler F. Treatment of glioblastoma in adults. *Therapeutic Advances in Neurological Disorders*. 2018;11:175628641879045. doi:10.1177/1756286418790452

Wick W, Platten M. Understanding and Treating Glioblastoma. *Neurologic Clinics*. 2018;36(3):485-499. doi:10.1016/j.ncl.2018.04.006

<u>Provided by CAC Members</u>

Chang E, Patel CB, Pohling C, et al. Tumor treating fields increases membrane permeability in glioblastoma cells. *Cell Death Discovery*. 2018;4(1):1-13. doi: 10.1038/s41420-018-0130-x

Kim EH, Kim YJ, Song HS, et al. Biological effect of an alternating electric field on cell proliferation and synergistic antimitotic effect in combination with ionizing radiation. *Oncotarget*. 2016;7(38):62267-62279. doi:10.18632/oncotarget.11407

Kim EH, Song HS, Yoo SH, Yoon M. Tumor treating fields inhibit glioblastoma cell migration, invasion and

angiogenesis. *Oncotarget*. 2016;7(40):65125-65136. doi: 10.18632/oncotarget.11372

**Open Meetings**

| MEETING DATE | MEETING STATE(S) | MEETING INFORMATION |
|---|---|---|
| 06/20/2019 | Maryland | Location:<br><br>Westin Baltimore Washington International Airport<br>1110 Old Elkridge Landing Rd<br>Linthicum Heights, MD 21090<br><br>Time: 9 AM - 12 PM EDT<br><br>See DME MAC websites for information |

**Contractor Advisory Committee (CAC) Meetings**

| MEETING DATE | MEETING STATE(S) | MEETING INFORMATION |
|---|---|---|
| 03/06/2019 | Maryland | Location:<br><br>Centers for Medicare & Medicaid Services<br>7500 Security Blvd<br>Baltimore, MD 21244 |

**MAC Meeting Information URL(s)**

N/A

**Proposed LCD Posting Date**

05/09/2019

**Comment Period Start Date**

05/09/2019

**Comment Period End Date**

06/24/2019

**Released to Final LCD Date**
**Please Note: This is not the LCD Effective Date.**

N/A

**Reason for Proposed LCD**

- Request for Coverage by a Supplier

**Proposed Contact**

DME MAC Medical Directors
Two Vantage Way
Nashville, TN 37228-1504
Two Vantage Way

Nashville, TN 37228-1504

TTFTLCDComments@cgsadmin.com

# Coding Information

**Bill Type Codes:**

Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type.Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.

N/A

**Revenue Codes:**

Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory. Unless specified in the policy, services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.

N/A

**CPT/HCPCS Codes**

**Group 1 Paragraph:**

The appearance of a code in this section does not necessarily indicate coverage.

**HCPCS MODIFIERS:**

EY - No physician or other licensed health care provider order for this item or service

GA - Waiver of liability statement issued as required by payer policy, individual case

GZ - Item or service expected to be denied as not reasonable and necessary

KX - Requirements specified in the medical policy have been met

**HCPCS CODES:**

**Group 1 Codes:**

| CODE | DESCRIPTION |
|------|-------------|
| A4555 | ELECTRODE/TRANSDUCER FOR USE WITH ELECTRICAL STIMULATION DEVICE USED FOR CANCER TREATMENT, REPLACEMENT ONLY |

| CODE | DESCRIPTION |
|------|-------------|
| E0766 | ELECTRICAL STIMULATION DEVICE USED FOR CANCER TREATMENT, INCLUDES ALL ACCESSORIES, ANY TYPE |

**ICD-10 Codes that Support Medical Necessity**

**Group 1 Paragraph:**

Not specified

**Group 1 Codes: N/A**

**ICD-10 Codes that DO NOT Support Medical Necessity**

**Group 1 Paragraph:**

Not specified

**Group 1 Codes: N/A**

**Additional ICD-10 Information**

N/A

# Associated Documents

**Attachments**

A52711 - TTFT Policy Article
(PDF - 233 KB )

**Related Local Coverage Documents**

Article(s)
A55426 - Standard Documentation Requirements for All Claims Submitted to DME MACs

**Related National Coverage Documents**

N/A

# Keywords

N/A

# ATTACHMENT 4:

## CRD Ruling May 28, 2019

# Department of Health and Human Services

## DEPARTMENTAL APPEALS BOARD

### Civil Remedies Division

*In re* LCD Complaint:
Tumor Treatment Field Therapy
LCD ID Number:  L34823
Contractor:  CGS Administrators, LLC

Docket No. C-19-396

Date: May 28, 2019

## ORDER REGARDING DISCOVERY AND
## ADDITIONAL EVIDENCE

Om May 20, 2019, CGS Administrators, LLC (CGS) filed its "Contractor's Response to the Aggrieved Party's Statement Regarding the LCD Record, Motion to Strike the LCD as Invalid, and Motion to Supplement Complaint (CGS response).  Under the regulations, the next step is for me to evaluate the evidence that has been submitted and determine if "the LCD record is complete and adequate to support the validity of the LCD" under the reasonableness standard.  42 C.F.R. § 426.425(c)(1).  For the reasons stated below, I conclude that the record presently is insufficient to support the validity of the challenged provision in LCD L34823.  As a result, I order the parties to indicate whether they want me to close the record in this case or whether they want to engage in discovery or otherwise provide me with additional evidence.  42 C.F.R. § 426.425(c)(3).

## I. The LCD's record does not support the LCD's validity.

After I accepted the Aggrieved Party's Complaint in this matter, in conformance with the regulations governing this case, I ordered CGS to file the LCD record, the Aggrieved Party to file a statement explaining why the LCD is not valid, and CGS to file a response defending the LCD.  *See* 42 C.F.R. §§ 426.410(d)(3), 426.425(a)-(b).  The parties have completed their submissions.  I have reviewed the submissions and conclude that the LCD record is insufficient to support the LCD's categorical denial of coverage for tumor treatment field therapy (E0766) (TTFT).

### A. The Aggrieved Party has standing to challenge the LCD.

CGS indicated that the Aggrieved Party's "LCD complaint is inapplicable as binding to the [Medicare Advantage] Plan" because Medicare Advantage Plans "have the option of providing individualized care if desired . . . and thus, are not bound to cover only Medicare-covered services." CGS Response at 1. Although not entirely clear, CGS appears to be challenging the Aggrieved Party's standing to challenge the LCD.

If this is the case, CGS is mistaken in its argument because an "Aggrieved party" includes enrollees in Medicare managed care plans so long as coverage for a service was denied based on the challenged LCD. 42 C.F.R. § 426.110. The Aggrieved Party meets these requirements. A. Ex. 8 at 5-6. Therefore, the Aggrieved Party has standing to challenge the LCD. 42 C.F.R. § 426.320(a).

### B. An Aggrieved Party may challenge an LCD because it is outdated.

CGS asserted that the LCD record shows that the LCD was valid at the time the LCD was adopted. CGS further indicated that there is a reconsideration process for revising LCDs in the Medicare Program Integrity Manual, Chapter 13. CGS then concluded that "[n]either the relevant Statutes, Federal rules and regulations, nor sub-regulatory guidance issued by [the Centers for Medicare & Medicaid Services (CMS)] contemplated the role of an LCD Challenge as an alternate pathway for an LCD Reconsideration." CGS Response at 3-4, 7.

CGS misunderstands both the LCD challenge process and how it relates to the LCD reconsideration process. Congress established LCDs and provided some basic requirements related to the development of LCDs. 42 U.S.C. § 1862(*l*)(5). However, Congress also established an LCD review process, to be conducted by an administrative law judge (ALJ). 42 U.S.C. § 1395ff(f)(2). This process is meant to determine the validity of the LCD. *Id*. § 1395ff(f)(2)(i)(I). In promulgating the regulations to implement this process to challenge an LCD, the Secretary of Health and Human Services (Secretary) made it clear that the process for challenging the validity of an LCD may be invoked because "a challenger may believe that a policy that was correct when it was issued has become outdated and is no longer valid in light of advances in medicine." 68 Fed. Reg. 63,692, 63,700 (Nov. 7, 2003). In fact, the Secretary expressly permitted aggrieved parties to submit new evidence concerning the LCD so that the ongoing validity of the LCD could be tested. *Id*.; *see also* 42 C.F.R. § 426.403.

Further, the Secretary was fully aware of the LCD reconsideration process and provided procedures by which the contractor or the ALJ could evaluate whether new evidence submitted in the case warranted a reconsideration of the LCD. 42 C.F.R. §§ 426.340, 426.417. As stated in the preamble to the final rule:

We have modified the procedures at § 426.340 to allow the ALJ/Board to make a preliminary determination on whether the new evidence submitted would have a significant bearing on the validity of the LCD/NCD. If the evidence is found significant, it would be sent to the contractor/CMS to determine whether the contractor/CMS agrees that the evidence warrants a formal reconsideration. As mentioned earlier, the reconsideration process would be time limited but would allow the public to submit medical and scientific evidence and allow the agency to fully develop the record in light of advances in medical science. Following the time-limited reconsideration, a supplemental record would be filed and the adjudication could continue, if necessary.

This approach will provide the contractor/CMS the initial opportunity to permit medical and scientific experts to examine the new evidence and to make findings of fact concerning the new evidence. Among other things, the statute requires that the ALJ/Board "shall defer only to the reasonable findings of fact" and it was impossible for the agency to have made findings on evidence that did not yet exist or that had not been furnished to the agency for consideration. We believe this approach is necessary to ensure that the medical and scientific opinions of the agency experts illuminate the record, since these appeals could involve very technical medical and scientific material related to the new evidence.

68 Fed. Reg. at 63,700. The Secretary knew that the LCD review process and reconsideration processes are different. The preamble to the final rule stated:

### 5. Differences Between an LCD/NCD Review and an LCD/NCD Reconsideration

The main difference between an LCD/NCD review under section 522 of the BIPA and an LCD/NCD reconsideration is the avenue an individual chooses to take to initiate a change to a coverage policy and who may initiate the review. All interested parties, including an aggrieved party, may request a reconsideration of an LCD or NCD, rather than filing a complaint to initiate the review of an LCD or NCD. Conversely, only an aggrieved party may file a complaint to initiate the review of an LCD or NCD. If the aggrieved party

> believes that we, or the contractor, misinterpreted evidence or
> excluded available evidence in making the coverage
> determination or has new evidence to submit, then the
> aggrieved party has the option to file a request for a
> reconsideration by the contractor or us, respectively, or to file
> a complaint to seek review by an adjudicator.
>
> In the reconsideration process, all interested parties, not just
> aggrieved parties, have the opportunity to submit new
> scientific and medical evidence for review by individuals
> with medical and scientific expertise. The reconsideration
> process permits experts to make judgments about those
> policies, rather than using an adjudicatory proceeding.

68 Fed. Reg. at 63,694. Another major distinction between the LCD review process
before an ALJ and the reconsideration process before a contractor is that an ALJ can only
decide that an LCD provision is no longer valid, but cannot revise the LCD provision.
42 C.F.R. §§ 426.405(d)(14), 426.450(a)(2).

### C. The LCD's record is inadequate to support the validity of the LCD.

CGS filed the record of the LCD in this case. The LCD was published in 2015, and the
entire LCD record consists of documentation and reports from that time and earlier.
However, the Aggrieved Party has submitted many documents and reports that more
recently show the efficacy of TTFT, at least within certain parameters. Significantly, the
Aggrieved Party has submitted 21 out of the 29 reports and journal articles that CGS has
considered in the reconsideration process that CGS has already started. A. Exs. 5-6, 12,
70-72, 82, 95, 122-123, 125, 129, 136-137, 139, 143, 146, 150, 155, 157, 158; CMS Ex.
43 at 10-13. Further, based on these documents, CGS, along with other Medicare
contractors, have proposed to remove the categorical prohibition on coverage of TTFT to
permit coverage if specific criteria are met. CMS Ex. 44.

### II. The parties may request to engage in discovery and submit additional evidence.

The regulations state:

> If the ALJ determines that the LCD record is not complete
> and adequate to support the validity of the LCD, the ALJ
> permits discovery and the taking of evidence in accordance
> with §§426.432 and 426.440 and evaluates the LCD in
> accordance with §426.431.

42 C.F.R. § 426.425(c)(3).

In the present case, the Aggrieved Party appears likely to have submitted all of the evidence it plans to submit and CGS has already indicated that it neither plans to submit written direct testimony for any witnesses nor cross-examine the Aggrieved Party's witnesses.  However, the parties will indicate by **June 5, 2019**, if they want to pursue discovery or to submit additional evidence.

Further, if the parties have objections to any of the exhibits submitted thus far by the other party, written objections must be submitted by **June 5, 2019**.

When the evidentiary record closes in this case, I will next need to determine whether the new evidence in the record is significant and permit CGS an opportunity to conduct a reconsideration.  42 C.F.R. § 426.340.

Scott Anderson
Administrative Law Judge

Addressees:

Debra M. Parrish, Esq.
788 Washington Road
Pittsburgh, PA  15228
bridget@dparrishlaw.com
*Served by DAB E-File*

Stacey V. Brennan, M.D.
Chief Medical Officer, Jurisdiction B DME MAC
Ashley Barnett, R.N.
Medical Affairs Coordinator
CGS Administrators, LLC
Two Vantage Way
Nashville, TN  37228
stacey.brennan@cgsadmin.com
ashley.barnett@cgsadmin.com
*Served by DAB E-File*